

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1822 | **DATE** | 3/31/2004 |
| **CASE TITLE** | | Koerber vs. Journey's End Inc. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, judgment is entered in favor of plaintiff and against defendant in the amount of $50,000.00. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | MAR 31 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | | 98 |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | | |
| MF | courtroom deputy's initials | | | Date/time received in central Clerk's Office | | mailing deputy initials |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KAREN A. KOERBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99 C 1822 |
| | ) | |
| JOURNEY'S END, INC., an Illinois corporation, | ) | Judge John W. Darrah |
| d/b/a/ The Annex Lounge, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

MAR 3 1 2004

## OPINION AND ORDER

Plaintiff, Karen A. Koerber, filed suit against Defendant, Journey's End, Inc., for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff alleges that she was sexually harassed by an employee of Defendant, thus causing her place of employment to be a hostile work environment. Trial was by the Court without a jury on October 28, 29, and 30, 2003, and on November 6, 2003.

The Court has considered the evidence, including the testimony of witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence as well as the Court's determination of the credibility of the trial witnesses. To the extent that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of

9P

Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

Defendant is the owner and operator of a restaurant and a bar, the Annex Lounge (the "Annex"), in Mundelein, Illinois, and is an employer, as defined by 42 U.S.C. § 2000, *et seq.* Defendant has more than 14 and fewer than 101 employees. Defendant is owned and operated by George Orfanos, Greg DiPiero, and Donna DiPiero (collectively, "the owners"). Plaintiff is a female who was hired by Defendant to work at the Annex as a waitress in August 1993.

Plaintiff was interviewed and hired by Ernie Young, who was and remained Plaintiff's direct supervisor throughout her employment for Defendant. Young was the bar manager at the Annex. He reported to the owners and had supervision over the bartenders and the waitresses at the Annex. Plaintiff did not meet any of the owners on the day she was hired, and Plaintiff did not meet any of the owners until approximately one year after she was hired.

At the time Plaintiff was hired, Young did not inform her of any policy against sexual harassment, nor did he explain to Plaintiff what sexual harassment was. Moreover, neither Plaintiff nor any other employee received a memo, letter, or any other written correspondence discussing Defendant's so-called "open-door" policy to report problems, including sexual harassment problems, when they began working for Defendant. Young also failed to discuss this open-door policy with Plaintiff, and no training about sexual harassment was ever provided to Plaintiff or any other employee. Furthermore, the open-door policy was not posted or placed in writing for the employees.

When Young hired Plaintiff as a waitress, he needed someone to begin working immediately. However, Plaintiff had a health condition that required her to take time off for

2

medical procedures. Young had the power to schedule shifts; and he and Plaintiff reached an agreement that Plaintiff would start immediately, and Young would not penalize her when she was absent for medical reasons. It would have been difficult, because of pain, for Plaintiff to work full time at the Annex with her injuries; and Plaintiff felt that she could not get a job anywhere else with the flexible hours available at the Annex and required by her medical condition.

In April 1994, Jennifer Denney, another waitress at the Annex, filed a charge of sexual harassment with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission (the "EEOC") against Defendant based on Young's conduct toward Denney. Young admitted to Greg DiPiero that he had touched Denney's breast behind a closed door to his office. Defendant settled this claim with Denney for $20,000.

Young was required to pay the settlement amount back to Defendant, even though he was only making about $30,000 per year working at the Annex. In addition to paying the $20,000 back to Defendant, Young was required to sign a "Last-Chance" Agreement. This Agreement provided that the owners and management of Defendant do not condone the harassment of any patron or employee and that any such activity would result in Young's immediate termination. Young signed the Agreement on April 20, 1994. The owners also gave Young a verbal warning and told Young that his harassing conduct was unacceptable, and he would not work at the Annex if the conduct occurred again.

Young's harassment of Plaintiff began as early as August 1993, when he grabbed Plaintiff's buttocks. Thereafter, despite signing the Denney Last-Chance Agreement, Young's harassing conduct toward Plaintiff continued. Young made comments of a sexual nature to

3

Plaintiff. Young engaged in conduct of a sexual nature towards Plaintiff, including brushing his hands across Plaintiff's breasts and patting Plaintiff's buttocks. Young made a comment to Plaintiff about the size of his penis and pointed to his genital area in Plaintiff's presence. Young kissed Plaintiff. Young also made comments about Plaintiff's breasts, how he would like to see them, and he offered Plaintiff money to see her breasts. Sometimes, these comments were made when customers were present in the Annex.

Young admitted to some of his harassing conduct. When he met with some of the owners of the Annex after Denney filed her charge in 1994, Young admitted that he patted Plaintiff's buttocks, brushed against her breasts, and kissed Plaintiff. He further admitted that he discussed his penis with Plaintiff and called her "a bitch." Young also admitted to brushing up against Plaintiff even though she asked Young to stop.

After Denney filed her claim, Plaintiff met with Denney's attorney to determine whether Plaintiff could file a charge of harassment. However, Plaintiff did not file a charge at that time because she could not afford to lose her job at the Annex.

Because of Young's harassing conduct, Plaintiff quit her job at the Annex on May 23, 1995. However, Plaintiff went back to work in June 1995 after meeting with the owners to discuss Young's harassing conduct.

After Plaintiff came back to work at the Annex, Young's harassing conduct continued throughout Plaintiff's employment. Young made sexually explicit remarks to Plaintiff as well. He told Plaintiff that he masturbated while thinking of Plaintiff. On Sundays, when the Annex was slow, Young offered Plaintiff one-hundred dollars in exchange for oral sex; Plaintiff emphatically rejected these propositions. Young made comments about the size of Plaintiff's

breasts, and he talked about his penis in front of Plaintiff. One time, Young asked Plaintiff and another female employee at the Annex, Trish Sloan, to compare breasts. Young also discussed Plaintiff's buttocks and his attraction to Plaintiff.

On or around August 21, 1996, Plaintiff was forced to use the men's restroom at the Annex because of a problem with the women's restroom. Plaintiff placed Matt Lagoni in front of the men's restroom to guard the door. However, Plaintiff heard a commotion; and Young walked into the men's restroom. Young started yelling and simulating an orgasm. Young further stated that he always wanted to be in the same room as Plaintiff when her pants were down. Plaintiff was in a toilet stall and yelled at Young and told him to get out.

Between August 1996 and January 1997, Young, on several occasions, brushed his hands across Plaintiff's breasts and pretended it was an accident. He would then comment and say, "Oh, sorry. If your breasts weren't so big, then it wouldn't be a problem," or something to that affect. During this time period, Young also came up behind Plaintiff and pretend to bear hug her. As Young would release his hands, he would touch her breasts. Plaintiff was offended by Young's acts and told him to "knock it off" or words to this effect. These incidents occurred when other people were in the bar.

Young also attempted to touch Plaintiff in other ways between August 1996 and January 1997. Young repeatedly pretended that he needed to speak with Plaintiff about something, lean in towards her, and then place his hand on Plaintiff's buttocks. Sometimes he did this act in the view of customers. Sometimes, Young grabbed Plaintiff and trirf to kiss her when her arms were locked down. On several occasions, Young squeezed Plaintiff's face and cheeks and kissed Plaintiff. Young made sexually lewd comments to Plaintiff during this time period, as well.

5

When Plaintiff needed a new work T-shirt, Young offered to give her a free one if she would undress in front of him.

Plaintiff was not receptive to these actions by Young throughout her employment at the Annex. Sometimes, Plaintiff told Young to knock it off or called him a pig. Other times, Plaintiff told Young to "go to hell" or asked him to leave her alone. Sometimes, Plaintiff slapped Young because of his offensive conduct.

Plaintiff became angry and embarrassed because of Young's conduct. Young's comments about Plaintiff's breasts caused her low self-esteem, and she contemplated breast reduction surgery. When Young touched Plaintiff's breasts, she felt violated, degraded, and humiliated.

On or around January 24, 1997, just two days before Super Bowl Sunday, Plaintiff quit her job at the Annex. Super Bowl Sunday was one of the most lucrative days for tips for the waitresses at the Annex. Plaintiff was originally scheduled to work on Super Bowl Sunday, January 26, 1997; but Young cancelled her shift that day. On the Thursday before Super Bowl Sunday, Plaintiff called Young at 5:30 p.m. to cancel her shift that day because she was sick; Plaintiff's shift started at 6:00 p.m. Plaintiff's cancellation required Young to call other staff members and see if they could work for Plaintiff with very little prior notice. Plaintiff's conduct inconvenienced the Annex staff, and Young cancelled Plaintiff's Super Bowl shift as a result.

Defendant, in spite of Young's previous actions towards Denney, did not adopt a formal plan to stop sexual harassment at the Annex. Defendant did place an Equal Employment Opportunity poster in the bar by the ice cooler. This poster remained on the wall throughout the entire time Plaintiff worked at the Annex. However, the poster did not contain any specific notices about an employee's rights concerning sexual harassment. Rather, the poster only

6

contained general information about an employee's rights to be free from discrimination based on race, color, religion, sex, or national origin.

Although the owners required Young to sign the Last-Chance Agreement, the owners failed to enforce its terms. One employee, Steve Miller, visited with one of the owners, Orfanos, in 1996 after he was terminated by Young for taking a break following a twelve-hour shift. The next day, Miller spoke with Orfanos and explained the matter to him. Orfanos rehired Miller; and at that point, Miller told Orfanos of Young's constant improper behavior. Miller told Orfanos that Young was constantly harassing any female employees and customers and that people were sick of this conduct and did not want to put up with it. In reply, Orfanos simply said, "[t]hat's Ernie." Plaintiff made similar complaints about Young. Despite these complaints, no internal investigation was ever taken; Young was never reprimanded; his salary was not reduced; and he was never suspended, demoted, terminated or disciplined in any manner.

Defendant installed a video recording system at the Annex. The cameras in the Annex were focused on the bar and the waitress station. Donna DiPiero could review the tapes from the system. The video tapes, though, were only reviewed if there was a shortage in the money counted at the Annex. If there was no shortage, the contents of the tapes, which were recorded daily, were taped over and those images were destroyed. Young had access to the video equipment and could turn the video system off as well. Further, Young knew which areas of the Annex were under video surveillance.

While working at the Annex, Plaintiff worked two nights a week for a total of seventeen hours at an hourly rate of $2.50 plus tips. According to Plaintiff's 1996 W-2 statement, she earned $5,285.00 per year working for Defendant. According to Plaintiff's 1995 W-2 statement,

7

she earned $3,736.00 working for Defendant. According to Plaintiff's 1994 W-2 statement, she earned $3,683.25 working for Defendant.

After Plaintiff quit her job at the Annex, she sought other employment. Plaintiff was employed as a waitress for Kemper Lakes Gold Club from March 1997 until November 1997. From November 1997 until April 1998, Plaintiff was employed part-time as a receptionist at the Brickman Group. She took maternity leave from her job at the Brickman Group. From September 1999 until January 2000, Plaintiff was employed at Toddler's Time for about $8.00 per hour, and subsequently at Children's World for an unspecified period for about $8 per hour. Finally, Plaintiff worked briefly at Zanie's Comedy Club in Vernon Hills, Illinois. On most nights she worked at Zanie's, Plaintiff earned somewhere between $40.00 and $60.00 in tips. However, it is unknown exactly how much Plaintiff has earned since leaving her employment at the Annex. Plaintiff is also not sure when she was last employed.

Plaintiff filed her charge of employment discrimination with the EEOC on June 17, 1997. Three-hundred days prior to this filing is August 21, 1996.

## CONCLUSIONS OF LAW

The following issues are before the Court: (1) whether Plaintiff was subjected to a hostile work environment and whether Defendant has proved, by a preponderance of the evidence, an affirmative defense pursuant to the holding in *Ellerth* and *Faragher*; (2) whether Plaintiff's charge with the EEOC was timely filed; (3) whether Plaintiff was constructively discharged and, if so, whether that affirmative defense has been proven; and (4) whether Plaintiff is entitled to damages and, if so, how much.

8

### Hostile Work Environment

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a hostile work environment claim based on sexual harassment, a plaintiff must prove that her work environment was both subjectively and objectively offensive. To be an objectively offensive work environment, a reasonable person must find the environment hostile or abusive. To be a subjectively hostile work environment, the victim must also perceive the environment to be offensive. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (*Cerros*).

The plaintiff must also show that the harassment was based on her membership in a protected class, the conduct was severe or pervasive, and a basis for employer liability exists. *Cerros*, 288 F.3d at 1045. To be severe or pervasive, the wrongful conduct must "alter[] the conditions of [the victim's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (*Faragher*) (second alteration in original).

To determine whether conduct is severe or pervasive, "a court must consider the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cerros*, 288 F.3d at 1046 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Thus, the social context of the offending behavior must be carefully considered in determining whether conduct is severe or pervasive. *Cerros*, 288 F.3d at 1046.

Young's conduct towards the Plaintiff specifically found above created a working environment which was abusive for the Plaintiff, to say the least. From the beginning of her employment with Defendant, Young's sexual harassment of Plaintiff was both severe and pervasive. His conduct was physically threatening and humiliating and included frequent touching, grabbing, and other deliberate physical contact with Plaintiff's buttocks and breasts. Young's comments and utterances were likewise threatening and humiliating to Plaintiff. These statements by Young included comments about Plaintiff's breasts and buttocks, Young's penis, requests that the Plaintiff remove her shirt in front of him, and invitations to engage in oral sex with him. Some of these statements were made by Young in the presence of Defendant's customers. Young physically and verbally sexually harassed Defendant throughout her employment with Defendant.

Young's verbal and physical conduct was excessive and repetitive. Moreover, his repeated actions were severe and carried out over Plaintiff's objections. The totality of the circumstances indicates that Young's conduct altered the conditions of Plaintiff's working environment and created a hostile working environment. Plaintiff remained employed at the Annex only because it provided the flexible work hours which she required. A reasonable person subjected to this sort of repetitive conduct would find it humiliating. Suffering this type of harassment from a supervisor would unreasonably interfere with an objective person's work performance. Accordingly, Plaintiff has proven, by a preponderance of the evidence, that Young's conduct was objectively offensive.

Plaintiff specifically voiced her desire that Young's conduct stop on numerous occasions, as well. Sometimes, she would push Young. When Young asked Plaintiff for oral sex, Plaintiff,

10

in a very direct manner, told Young no.  On other occasions, Plaintiff slapped Young for his inappropriate conduct.  Specifically, Plaintiff was upset after the bathroom incident with Young.

Based on these circumstances, Plaintiff has proven, by a preponderance of the evidence, that her work environment was subjectively hostile and that she objected to Young's conduct and felt humiliated by his actions.

Plaintiff has also proven, by a preponderance of the evidence, that: (1) as a female, she is a member of a protected class; and (2) she was harassed and subjected to a hostile work environment because of her gender.

Defendant has asserted an affirmative defense pursuant to the holdings in *Burlington Industries v. Ellerth*, 524 U.S. 742 (1988) (*Ellerth*) and *Faragher*, 524 U.S. 775.  A defendant in a sexual harassment suit who did not take a tangible employment action against the plaintiff may avoid liability if it can show that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities.  *See, e.g., Sappington*, 351 F.3d at 331.  The defendant is required to prove, by a preponderance of the evidence, that both elements of the defense have been satisfied.  *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 698 (7th Cir. 2001) (*Haugerud*).

Both the Supreme Court and the EEOC have recognized that small businesses may establish informal policies to deal with hostile work environment claims.  *See Faragher*, 524 U.S. at 808 ("Unlike the employer of a small workforce, who might expect that sufficient care to prevent tortious behavior could be exercised informally . . . ."); EEOC Notice 915.002 ("It may not be necessary for an employer of a small workforce to implement the type of formal complaint

11

process described above. If it puts into place an effective, informal mechanism to prevent and correct harassment, a small employer could satisfy the first prong of the affirmative defense to a claim of harassment."). However, the process must be effective; the employer must pursue an internal investigation or take some other appropriate remedial action. *See Haugerud*, 259 F.3d at 699.

Here, it is undisputed that Defendant had no formal, written policy against sexual harassment at the Annex. Defendant, though, argues it had other mechanisms in place to report and prevent problems. Specifically, Defendant argues that an EEO poster detailing employees' rights was placed above a cooler; a video recording system was put into place to monitor the Annex; the owners had an informal, open- door policy to report problems; and a "Last-Chance Agreement" with Young was implemented.

However, the EEO poster did not contain any specific notices about an employee's rights concerning sexual harassment. Rather, the poster only contained, in general terms, information about an employee's rights to be free from discrimination based on race, color, religion, sex, or national origin. A general poster generally disclosing an employee's workplace rights does not prove that an employer had a policy in place that would prevent and correct promptly any sexually harassing behavior and is not sufficient evidence that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior by implementing an informal policy against sexual harassment at the Annex.

Defendant's video recording system also fails to demonstrate that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior by implementing an informal policy against sexual harassment at the Annex. The video tape system

12

was to prevent theft at the Annex; Young could turn the video system off, and Young knew which areas were under video surveillance. Under these circumstances, it cannot be said that the video system would prevent and correct promptly any sexually harassing behavior by Defendant's employees.

Defendant's so-called open-door policy to discuss problems also fails to demonstrate that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior by implementing an informal policy against sexual harassment at the Annex. This policy was not in writing and posted for its employees to see. Nor did employees receive a memo, letter, or any other writing disclosing this so-called open-door policy upon commencing employment. Young, Plaintiff's direct supervisor and the person who hired Plaintiff, did not inform Plaintiff of any open-door policy when she was hired. Nor did any of the owners ever discuss an open-door anti-harassment policy with Plaintiff; rather, Plaintiff did not even meet any of the owners until approximately one year into her job.

Finally, the Last-Chance Agreement implemented with Young fails to demonstrate that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior by implementing an effective policy against sexual harassment at the Annex. The Last-Chance Agreement states that the Defendant does not condone the harassment of any patron or employee and that any such activity will result in immediate termination. However, as set out above, when one employee, Miller, told Orfanos, one of the owners, in 1996 of Young's behavior towards female employees and customers, the owner simply said "[t]hat's Ernie." Plaintiff made similar complaints about Young. In each instance, no evidence was presented that the Defendant pursued an internal investigation or took any remedial actions.

13

Based on the totality of the circumstances, the Defendant has failed to prove, by a preponderance of the evidence, that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. Accordingly, Defendant has failed to prove that both elements of the *Ellerth/Faragher* affirmative defense have been satisfied; and a basis for employer liability thus exists.

### The EEOC Filing Requirement

Before filing a Title VII discrimination suit in federal court, a plaintiff must bring a charge of discrimination with the EEOC within 300 days of the alleged acts giving rise to his or her claims. *See, e.g., Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995). Acts of discrimination which occurred outside the 300-day period are time-barred both before the EEOC and in federal court.

Here, Plaintiff may recover for acts of harassment that occurred on or after August 21, 1996, which is 300 days prior to her filing of the EEOC charge on June 17, 1997. On or around August 21, 1996, Young entered the men's bathroom and sexually harassed Plaintiff, as discussed above. Throughout the remainder of 1996 and the early part of 1997, Young made references to customers about Plaintiff's breasts in front of Plaintiff, touched Plaintiff's buttocks, and, on several occasions during this time period, squeezed Plaintiff's cheeks and kissed Plaintiff. Accordingly, Plaintiff has proven, by a preponderance of the evidence, that an act contributing to her hostile work environment claim occurred during the 300-day filing period.

However, if Plaintiff can establish that the post-August 21, 1996 acts were a part of a continuing violation, she may recover for all acts of sexual harassment that she endured during her employment at the Annex. Plaintiff must demonstrate that "there has been a pattern or policy

14

of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered . . . timely." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999) (alteration in original).

In contrast to a discrete discriminatory event, hostile work environment claims are series of separate acts that together constitute one "unlawful employment practice" under 42 U.S.C. § 2000e-5(e)(1). *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (*Morgan*). For a hostile work environment claim, it is irrelevant that some of the hostile acts occur outside the statutory time period. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117.

Plaintiff has proved, by a preponderance of the evidence, that discriminatory acts occurred within the 300-day filing period – between August 21, 1996 and June 17, 1997. Plaintiff was first harassed at the Annex in August, 1993; and the harassment continued past August 21, 1996, and throughout Plaintiff's employment at the Annex. Thus, under the continuing violation doctrine, Plaintiff may recover for all acts of sexual harassment she suffered while she was employed by Defendant. Therefore, Plaintiff may recover for all acts of harassment she suffered while working at the Annex between August 1993 and January 1997.

Defendant contends that even though conduct more than 300 days before the EEOC filing requirement may be considered, an employer may also assert equitable defenses, such as waiver and estoppel, when a plaintiff unreasonably delays filing a charge. *Morgan*, 536 U.S. at 121. Thus, an employer may raise the equitable defense of laches if the plaintiff: (1) lacked diligence

in asserting her claim and (2) prejudiced the defendant through this lack of diligence. *Morgan*, 536 U.S. at 121-22.

Generally, the longer the plaintiff delays in filing a claim, the less prejudice the defendant is required to show in order to defend based on laches. However, even for an extended delay, a defendant is still required to make a minimal showing of material prejudice, "meaning it affects the substantial rights of the defendant to such a degree that it justifies the equitable relief of barring the plaintiff's claims." *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 734 (7th Cir. 2003) (*Smith*).

Defendant contends that Plaintiff knew she was a possible victim of sexual harassment as early as spring of 1994, when she consulted with Denney's attorney and perceived herself to be a victim of Young's abuse. Thus, Defendant claims it was economically harmed because it was deprived of the opportunity to handle the matter internally instead of paying backpay for a delayed lawsuit.

Defendant, though, had an opportunity to address Plaintiff's complaints against Young but failed to take appropriate measures. Plaintiff resigned from the Annex in May 1995 as a result of Young's conduct. However, Young's harassing conduct of Plaintiff resumed after she returned to work and had met with the owners and continued throughout the remainder of Plaintiff's employment at the Annex without any intervention by them.

Defendant has failed to demonstrate any prejudice it suffered by Plaintiff's failure to assert her claim earlier. Significantly, Defendant produced no evidence that: (1) as a result of the delay, it could not present testimony from pertinent witnesses because they were unavailable or their memories had faded; or (2) key documents relating to Plaintiff's employment were lost or

16

destroyed because of Plaintiff's delay. *See Smith*, 338 F.3d at 733. Therefore, based on all the

relevant facts, Plaintiff's delay in filing her EEOC charge did not materially prejudice Defendant

to such a degree that justifies the equitable relief of barring Plaintiff's claims.

*Constructive Discharge*

Plaintiff next argues that, because of the hostile working environment at the Annex, she

suffered a constructive discharge. Defendant argues that the working environment at the Annex

was not so hostile that Plaintiff was effectively forced to quit her employment.

"A constructive discharge occurs when an employee resigns his or her current position

because the employee considers the conditions intolerable and a reasonable employee also would

have found the conditions remaining in the job unbearable." *Robinson v. Sappington*, 351 F.3d

317, 336 (7th Cir. 2003) (*Sappington*). The working conditions for a constructive discharge must

be even more egregious than the conditions for a hostile work environment because, typically,

"an employee is expected to remain employed while seeking redress." *Sappington*, 351 F.3d at

336.

Plaintiff and a reasonable person would have felt that the conditions for remaining at the

Annex unbearable. As set out above, over the course of her three-year employment with

Defendant, Plaintiff was repeatedly subjected to offensive comments and humiliating unwanted

physical contact of a sexual nature, sometimes in front of customers, from her supervisor, Young.

The harassing conduct occurred at the Annex despite the owner's awareness that Young had both

previously and was currently harassing Plaintiff. Plaintiff's working conditions became so

unbearable that she was forced to quit her employment. Remaining at the Annex would have

subjected Plaintiff to further harassment and a cruel working situation. *See Sappington*, 351 F.3d

17

at 337. Therefore, Plaintiff has proven, by a preponderance of the evidence, that she was forced to quit her job at the Annex and was thus constructively discharged.

Defendant contends that this constructive discharge was not a "tangible employment action," for the purposes of the *Ellerth/Faragher* affirmative defense. Typically, tangible employment actions are discharges, demotions, or undesirable reassignments. *Ellerth*, 524 U.S. at 765. A tangible employment action, which inflicts economic harm on the employee, can only be made by a supervisor, who "has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." *Ellerth*, 524 U.S. at 762. In these situations, "there is assurance the injury could not have been inflicted absent the agency relation" between the supervisor and the employer. *Ellerth*, 524 U.S. at 761-62.

However, because either a supervisor or a co-worker can be the cause of a constructive discharge, "there is a concern that equating [a] constructive discharge with other types of tangible employment actions will impose liability on employers when the offending employee has not been empowered by the employer to take the actions at issue." *Sappington*, 351 F.3d at 335. Thus, for a constructive discharge to be a tangible employment action for purposes of the *Ellerth/Faragher* affirmative defense, the Seventh Circuit has added an additional requirement: official action by the supervisor must make the employment intolerable. *Sappington*, 351 F.3d at 336. The supervisor must not only harass the employee; but, also, the supervisor must so act in an "official, supervisory capacity" in making the employment environment intolerable. *Sappington*, 351 F.3d at 337.

18

Here, Plaintiff has failed to prove, by a preponderance of the evidence, that her constructive discharge was a tangible employment action. The only employment action taken by Young which could be considered an official act of a supervisor was his decision to cancel Plaintiff's shift at the Annex on Super Bowl Sunday, 1997, a lucrative day for a waitress such as Plaintiff. Young made this decision to discipline Plaintiff because she had previously called to say she would not be at work a half-hour before Plaintiff's shift was scheduled to begin, which severely inconvenienced the Annex staff. Plaintiff does not contend and has produced no evidence that Young's action in this regard was in any way related to his sexual harassment of Plaintiff.

Therefore, Defendant has properly asserted the *Ellerth/Faragher* defense; and it must be determined whether Defendant has proven both elements of this defense to the constructive discharge. However, as fully discussed above, Defendant has not proven, by a preponderance of the evidence, that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. Therefore, Defendant is liable for the constructive discharge of Plaintiff.

### *Damages*

Plaintiff seeks punitive damages, compensatory damages, and backpay for the harassing conduct and constructive discharge she suffered at the Annex. Under 42 U.S.C. § 1981a(a)(1), a plaintiff may recover compensatory damages and punitive damages, in addition to backpay. The total amount of compensatory damages and punitive damages that may be assessed against an employer with more than 14 but fewer than 101 employees, such as Defendant, is $50,000. 42 U.S.C. § 1981a(b)(3). However, backpay is not included in the calculation of compensatory damages. 42 U.S.C. § 1981a(b)(2).

19

To recover punitive damages, a plaintiff must demonstrate that the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). A three-part test is used to determine whether the assertion of punitive damages is proper. First, a plaintiff must demonstrate the employer acted with the requisite mental state. To satisfy this element, a plaintiff may show that "relevant individuals knew of or were familiar with the antidiscrimination [sic] laws and the employer's policies for implementing those laws." *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 661-62 (7th Cir. 2001) (*Hertzberg*) (quoting *Bruso v. United Airlines*, 239 F.3d 848, 857-58 (7th Cir. 2001) (*Bruso*)).

Plaintiff has proven, beyond a preponderance of the evidence, that Young was familiar with the anti-discrimination laws and his employer's policy for implementing those laws. Young was required to sign the Last-Chance Agreement, which stated that Defendant did not tolerate sexual harassment under any circumstances. Young was also given a verbal warning by the owners that he would be terminated if his harassing behavior continued. Under these circumstances, Young had enough familiarity with the anti-discrimination laws to understand that sexual harassment was illegal.

After a plaintiff meets this burden, she must show that the discriminating employees are managerial agents who acted within the scope of their employment. *Hertzberg*, 261 F.3d at 662. This inquiry is fact-intensive and looks at "the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out." *Hertzberg*, 261 F.3d at 663 (quoting *Bruso*, 239 F.3d at 858).

Here, Young, the bar manager at the Annex, interviewed, hired, and supervised Plaintiff. He had the power to arrange unique scheduling arrangements with employees, such as the agreement he made with Plaintiff when she started working at the Annex. Young could also remove staff members from shifts, including lucrative shifts during Super Bowl Sunday. Young thus had significant authority at the Annex and a considerable amount of discretion in hiring and scheduling. Therefore, Plaintiff has proven, by a preponderance of the evidence, that Young was a managerial employee acting within the scope of his employment when he sexually harassed Plaintiff.

If a plaintiff meets these burdens, the employer can still avoid liability for punitive damages. The employer must show that "it engaged in good faith efforts to implement an antidiscrimination [sic] policy." *Hertzberg*, 261 F.3d at 662 (quoting *Bruso*, 239 F.3d at 858).

In this case, Defendant has not proven, by a preponderance of the evidence, that it did engage in a good faith effort to implement an anti-discrimination policy. As discussed above, Defendant's display of one EEO poster, their video surveillance system limited to theft detection, the so-called, but non-existent, open-door policy, and the payment for Young's prior sexual harassment do not evidence a policy by Defendant to prevent discrimination at the Annex as occurred in this case.

Plaintiff suffered through repeated instances of sexual harassment over the course of approximately three years from her immediate supervisor. The owners, who were aware of both Young's prior conduct towards Denney and his conduct at the Annex generally, did nothing to protect female employees from harassment. But, significantly, Young was required to reimburse the Defendant $20,000 for the settlement with Denney. Defendant was ultimately not "out of

21

pocket" for Young's prior sexual harassment of Denney. Essentially, the owners simply relied on trusting Young not to harass any more female employees at the Annex and provided effectively nothing more to protect its employees. Because Plaintiff is entitled to the maximum allowable statutory damages, it is unnecessary to consider whether Plaintiff is entitled to compensatory damages. Based on the above, Plaintiff is entitled to $50,000 in punitive damages against Defendant, the maximum amount that can be awarded under § 1981a(b)(3).

Plaintiff also seeks backpay from Defendant. A district court has broad equitable discretion in fashioning backpay awards that make a Title VII plaintiff whole. *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003) (*David*). Once a violation of Title VII has been found, there is a strong presumption that the plaintiff is entitled to backpay for what she would have earned but for the discrimination. *David*, 324 F.3d at 865. However, "amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the backpay otherwise allowable." 42 U.S.C. 2000e-5(g)(1). Plaintiff is required to establish the amount of damages she seeks. *See E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990) (*Gurnee*).

Plaintiff seeks backpay, at a rate of $5,285.00 per year, based on her 1996 W-2 statement, starting from February 1997. Plaintiff then seeks backpay for one of two periods: (1) through the end of 2003, which would compensate Plaintiff through the completion of the trial; or (2) through the end of June 2001. However, based on Plaintiff's W-2 statements throughout her approximately three years at the Annex, Plaintiff earned an average of $4,234.75 per year.

Plaintiff worked continuously in replacement jobs from March 1997 until April 1998. Plaintiff has failed to show how much she earned during that time period to permit determination

of the amount of her loss of pay, if any, after leaving the Annex. Therefore, Plaintiff has failed to establish she is entitled to backpay from March 1997 to April 1998.

Plaintiff terminated her employment after April 1998 while she was pregnant. Plaintiff resumed employment in September 1999. This loss of pay from unemployment is not related to her unlawful discharge from the Annex. Therefore, Plaintiff may not recover backpay for this time period as well. From September 1999 until January 2000, Plaintiff made $8.00 per hour working at Toddler's Time. Plaintiff did not specify how many hours a week she worked or her total cumulative pay for this time period. Again, it is impossible to determine if she earned more or less than what she would have earned at the Annex. Plaintiff has failed to establish she is entitled to backpay from September 1999 until January 2000. Plaintiff then worked for an unspecified period, for $8.00 per hour, at Children's World. Finally, Plaintiff made approximately $40.00 to $60.00 per night, for an unspecified period, working at Zanie's Comedy Club. It is unknown when Plaintiff last worked. Accordingly, these amounts fail to properly establish the amount of backpay to which she may be entitled. Therefore, no backpay is awarded to Plaintiff.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiff and against Defendant in the amount of $50,000.00

Dated: March 31, 2004

JOHN W. DARRAH
United States District Judge

23